IN UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

W.T.,[1]

    Plaintiff,

v.                                                                           Civil Action No. _____

UNITED STATES OF AMERICA;
RDAP INSTRUCTOR HOSEA LEE

    Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, W.T., was sexually assaulted and battered while incarcerated at the federal prison in Lexington, Kentucky, known as the Federal Medical Center, Lexington ("FMC Lexington" or "FMC"). By and through her attorneys, she brings claims based upon the Eighth Amendment to the United States Constitution pursuant to the legal standards set forth in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2D 619 (1971), and based upon the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* and/or other applicable law. For her complaint against Defendants, W.T. states as follows:

## PARTIES

1.    Plaintiff, W.T., was at all times relevant to this complaint in the custody of the Federal Bureau of Prisons ("BOP"), including at FMC Lexington, which is the prison facility

---

[1]    These initials, and all initialized references to inmate victims of sexual assault at FMC Lexington, are pseudonyms used to protect the subjects' identities for personal safety reasons. These persons have legitimate fears of retaliation from correctional officials and/or present or former inmates for making public allegations regarding correctional officers.

located within the Eastern District of Kentucky where the sexual assaults described herein occurred.

2.      Defendant, the United States of America, is a sovereign entity named herein pursuant to the Federal Tort Claims Act and oversees the Federal Bureau of Prisons ("BOP"), which is responsible for the custody and care of federal inmates.

3.      Defendant, Hosea Lee ("Defendant Lee"), was at times relevant to this complaint employed by the BOP as a correctional officer working at FMC Lexington as a Residential Drug Abuse Program ("RDAP") instructor.

4.      Defendant Lee was at all times relevant to this complaint acting under color of law and within the scope of his employment with the United States BOP.

### JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 & 1346 (b)(1) as the claims in this case are brought against the United States of America under the Federal Tort Claims Act 28 U.S.C. 2671, *et seq.* and against the individual Defendant under the Eighth Amendment to the United States Constitution, pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).*

6.      Plaintiff filed an Administrative Claim (SF-Form 95), which was dated August 28, 2020, and received by the BOP on August 31, 2020.  By letter dated February 26, 2021, from the Federal Bureau of Prison's Mid-Atlantic Regional Office the claim was denied. Consequently, Plaintiff has exhausted all obligatory administrative remedies, and her FTCA claim is ripened for the filing of this civil action.

7.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1402(b), as some or all of the events upon which this action is based occurred in the Eastern District of Kentucky.

## **FACTS**

8.     At FMC Lexington, the BOP employs correctional officers, facilities staff and management to oversee and operate the prison facility.  The correctional officers are trained, managed, overseen and paid by the BOP through the United States Department of Justice, and serve "investigative or law enforcement" functions.

9.     As a federal inmate, W.T. was committed to the Government's care, custody, and control and while in such custody federal law specifically requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and to "provide for the protection ... of all persons charged with or convicted of offenses against the United States."  18 U.S.C. § 4042(a)(2)-(3).

10.     As a federal inmate, W.T.'s options for escaping sexual assault or for resisting the sexually abusive conduct of a correctional officer or other BOP employee were limited.  W.T. — like all inmates at FMC Lexington — relied on employees to protect her from sexual abuse by guards and other staff.

11.     As a condition of his employment, Defendant Lee was or should have been required to attend and complete the BOP's Correctional Training Program, Phases I (an introductory two-week course) and II (a three-week long course) and received a week of specific training on how to supervise female offenders.  Moreover, annually, or otherwise periodically, Defendant Lee would have received refresher training and continuing education on the prohibition of sexual abuse of inmates.

12.     Many of the BOP's policies are contained in documents titled "program statements" which set forth rules and procedures that all BOP employees are required to follow.

**Program Statement 3420.11 – Standards of Employee Conduct**

13.     Program Statement 3420.11 sets out the duties and responsibilities of all BOP employees.  It requires that employees, "[A]s soon as practicable (but no later than 24 hours) report to their CEO (or other appropriate authority such as the Office of Internal Affairs or the Office of the Inspector General) any violation, appearance of a violation, or attempted violation of these Standards or of any law, rule, or regulation.  Every employee is required to immediately report to management any act or omission by any person that could result in a breach of institution security.  Failure by employees to follow these regulations and policy or any other Bureau policy or relevant regulation(s) could result in disciplinary action, up to and including removal."

14.     Program Statement 3420.11 (Standards of Employee Conduct) mandates that "[n]o employee shall engage in, or allow another person to engage in, sexual behavior with an inmate.  There is never any such thing as *consensual* sex between staff and inmates."

15.     Program Statement 3420.11 states that BOP employees are subject to administrative action, up to an including removal, for any inappropriate contact, sexual behavior, or relationship with inmates, regardless of whether such contact constitutes a prosecutable crime.  Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature.

16.     Program Statement 3420.11 goes on to state that "Title 18, U.S. Code Chapter 109A provides penalties of up to life imprisonment for sexual abuse of inmates where force is used or threatened.  Sexual contact is defined as the intentional touching of the genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harass, degrade,

4

arouse, or gratify the sexual desire of any person.  All allegations of sexual abuse will be thoroughly investigated and, when appropriate, referred to authorities for prosecution."

17.     Each new BOP employee, contractor, and volunteer must receive and sign a form acknowledging receipt of Program Statement 3420.11.

18.     Program Statement 5324.12 (Sexually Abusive Behavior Prevention and Intervention Program) concerning the prevention of, and intervention upon sexually abusive behavior, implements zero tolerance toward all forms of sexual activity, including sexual abuse and sexual harassment, and provides guidelines to address prohibited and/or illegal sexually abusive behavior.

19.     Program Statement 5324.12 is the controlling BOP policy addressing the prevention of, and intervention upon, sexually abusive behavior.  It is disseminated agency-wide and applies to all facilities operated by the BOP and every staff member working within each correctional facility.

20.     Program Statement 5324.12 lays out duties and responsibilities with respect to conduct for all BOP employees, and mandates particular staff and agency reporting duties with respect to sexually abusive behavior, including concerning incidents or possible incidents of sexual abuse or sexual harassment:  it mandates that "[a]ll staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement 3420.11."

21.     BOP policy requires the training of all employees who may have contact with inmates on how to fulfill their responsibilities under agency sexual abuse and sexual harassment prevention, detection, reporting, and response policies and procedures.

5

22.     Inmates, employees, and the public may file a complaint at the BOP facility where an incident of sexual abuse occurred; through BOP's Office of Internal Affairs ("OIA"); or with the Department of Justice Office of Inspector General ("OIG").  In accordance with the agency's own Standards of Employee Conduct, BOP employees must report any violation of those Standards, or any rule or law within one business day of the incident to their Chief Executive Officer ("CEO"), OIA, or the OIG. Decisions regarding disciplinary action in cases where the allegations are sustained are managed by BOP's Human Resources Management ("HRM") and BOP's Office of General Counsel.

### *Defendant Lee's Sexual Assaults of Plaintiff*

23.     At FMC Lexington, like other federal prisons, inmates may be required to take part in a program known as "RDAP" – the Residential Drug Abuse Program.

24.     Successful completion of the RDAP program could secure W.T. many valuable incentives and awards including but not limited to: early release; money; preferred living quarters; special recognition privileges; personal property allowances; photographs of an RDAP completion ceremony sent to her family members; and a nearer-release transfer.

25.     While passing RDAP carries a host of awards, failing RDAP has grave consequences, including but not limited to:  ineligibility for a reduced sentence; revocation of any prior incentives given (e.g. money); transfer back to prior institution; extended length of community confinement; ineligibility for a furlough (other than possibly an emergency furlough); ineligibility for performance pay above maintenance pay level, bonus pay, or vacation pay; ineligibility for the Federal Prison Industries work program assignment.

26.     The RDAP program has multiple parts, from "nonresidential treatment" to core RDAP courses to Aftercare, and all components are required.

6

27.     Some RDAP instructors, such as Defendant Lee, teach multiple parts of the program, which can take over a year, and an inmate may encounter the same instructor over and over again.

28.     Staying on good terms with a teacher is a critical component of passing the entire program.

29.     W.T. was told that the first mandatory step in the RDAP program was to attend nonresidential treatment, and if W.T. did not attend this nonresidential portion of the program, she could not continue in RDAP.

30.     Plaintiff's nonresidential treatment consisted of pass/fail classes taught by Defendant Lee.

31.     The BOP grants instructors such as Defendant Lee wide discretion to determine an inmate's passage or failure of any component of the RDAP program—and hence, to determine whether an inmate receives punishment or rewards such as an early release.

32.     Correctional officers can cause an inmate's failure due to vague infractions such as not adequately taking part in their recovery or not having adequate participation in class.

33.     Defendant Lee controlled W.T.'s ability to progress through the RDAP program.

34.     If W.T. did not receive a passing mark from Defendant Lee, she would fail her nonresidential requirement and be precluded from moving on to the next step in the RDAP program; in that event, she would have to move through what could be a lengthy administrative process, thereby jeopardizing and delaying any psychological support she might receive in recovery and any incentives available.

35.    The power the BOP gave to Defendant Lee rendered inmates such as W.T. very vulnerable to any illicit demands he might choose to make, and Defendant Lee fully exploited this power for his sexual gratification.

36.    When W.T. began her recovery class with Defendant Lee, she noticed that he was immediately breaching the appropriate boundary between staff and inmates.

37.    For instance, he told the class that he was not like other officers.

38.    Soon after W.T. began the course, Defendant Lee began overtly leering at her, and began sexualizing the questions out of the class textbook.

39.    By altering the textbook questions, Defendant Lee was able to get W.T. to disclose her children's names, and he openly guessed that their father was not white, an act which made W.T. both uncomfortable and offended.

40.    Defendant Lee learned that W.T. spoke Spanish fluently, and he began speaking to her in Spanish in front of the class, which she presumed no one else could understand. It made her feel uncomfortable and singled out for potentially inappropriate messages.

41.    W.T. was concerned that Defendant Lee knew of the extreme sexual abuse in her past and that he would consider her particularly vulnerable for sexual assault, and this concern came to fruition.

42.    As the class stood up to leave the room one day, Defendant Lee told W.T. in Spanish that he liked her eyes, and from there an escalation of sexual behavior occurred.

43.    Telling Plaintiff she was pretty, Defendant Lee told her to meet him in his office.

44.    W.T. went to Defendant Lee's office as she was commanded, fearing he would fail her if she did not comply and jeopardize her RDAP completion and early release.

8

45.    There were no cameras to record Plaintiff's entrance into Defendant Lee's office, there also were no cameras in his office, and the two were alone.

46.    Defendant Lee told W.T. to get in a very large closet and shut the door, and Plaintiff did what she was ordered.

47.    Defendant Lee then commanded Plaintiff to perform oral sex upon him, and again Plaintiff did what she was ordered.

48.    Afterward, Defendant Lee told her that it was her responsibility to keep the sexual encounter a secret from the other correctional officers.

49.    Defendant Lee told her that if she reported him, no one would believe her.

50.    Defendant Lee told her that even if her allegations were believed, she would be the one to be punished, not him. He said she would be convicted of "corrupting and compromising an officer."

51.    Defendant Lee ordered W.T. to return every two weeks for oral sex in the closet, and she complied with the order.

52.    After the sexual assaults began, Defendant Lee convinced W.T. that she was the only one he was having sex with and that if she heard otherwise, it was a lie.

53.    W.T. did learn about other inmates being assaulted by Defendant Lee, and two names she repeatedly heard were A.B. and A.H.

54.    Defendant Lee behaved in a way which indicated particular concern with A.H., who was regularly having herpes breakouts around her lips, and this distressed Plaintiff over concern that Defendant Lee transmitted the disease to her.

55.    Defendant Lee also seemed particularly concerned about A.B., who W.T. would learn was also having herpes outbreaks.

9

56.     W.T. learned that A.B. was also sexually assaulted by Defendant Lee and that the FBI had conducted some investigation into those assaults.

57.     Upon information and belief, extensive evidence was found by the investigators to confirm Defendant Lee's sexual assaulting of A.B.

58.     From the beginning of his sexual harassment to the completion of the sexual assaults, the course of Defendant Lee's predation upon W.T. lasted nearly a year.

**Post-Sexual Assault Events**

59.     Defendant Lee sexual misconduct was reported to the OIG and investigated by the FBI.

60.     Upon information and belief, extensive evidence was found about his pattern of sexual assaults.

61.     W.T. was interviewed as a part of the investigation.

62.     Initially, out of fear of retaliation, W.T. denied her involvement with Defendant Lee.

63.     A.B. wrote a letter to W.T.'s father and told him how W.T. had been attacked.

64.     W.T.'s father convinced W.T. to report Defendant Lee's assaults to SIS.

65.     Once W.T. admitted that Defendant Lee had sexually assaulted her, she felt it was then safe to be tested for herpes, and consequently she was tested.

66.     W.T. tested positive for Herpes I and II.

67.     A.B. also tested positive for Herpes I and II.

68.     Prior to incarceration, and therefore prior to Defendant Lee's sexual assaults, W.T. was given a standard STI test when she was pregnant and tested negative.

10

69.    Upon information and belief, both types of herpes were transmitted to W.T. by Defendant Lee.

70.    The herpes infection was and is both physically and emotionally injurious to W.T., it will require lifelong treatment, and it has no cure.

**Others' Knowledge of Defendant Lee's Unlawful Conduct**

71.    Upon information and belief, prior to and during Defendant Lee's sexual assaults, BOP personnel at FMC Lexington and other prison facilities knew or should have known of his propensity for sexual misconduct involving inmates.

72.    The site, circumstances and frequency of Defendant Lee's sexual assaults, and the fact that they involved multiple inmates, make it impossible for Defendant Lee's conduct to have been completely hidden from all other BOP personnel.

73.    For example, a counselor by the name of Ms. Cheney told W.T. in a hallway within earshot of other inmates that "something was not right" with Defendant Lee.

74.    Another counselor by the name of Dr. Shuster shared an office wall with Defendant Lee's office and the closet he used for sexual assaults. Dr. Shuster is believed to have witnessed inmates frequently entering and exiting Defendant Lee's office, knowing the inmates were alone and unmonitored with Defendant Lee.

75.    Dr. Shuster made comments to W.T. that indicated an awareness of the sexual assaults.

76.    Dr. Shuster suggested that W.T. had made some recent choices for which she alone was responsible.

11

77. In addition, W.T. saw a physician's assistant, Mr. Higgins, for pap smear. Later, Mr. Higgins revealed he had knowledge of W.T.'s sexual relationship with Defendant Lee, telling her he was jealous.

**Retaliation**

78. Once an investigation of Defendant Lee finally occurred, the result was that Defendant Lee was transferred to the men's prison where he was given the ability to monitor W.T. and other inmates' phone calls and email messages. Upon information and belief, this frequent BOP practice functions as retaliation for prisoners who report abuse.

79. As a result, W.T. did not feel safe talking to counsel or anyone else about what happened to her.

80. W.T. was transferred to Federal Prison Camp in Alderson, WV ("Alderson") placing her much farther from her family and making it significantly harder for them to visit.

81. W.T. was punished at Alderson because she reported Defendant Lee: she was isolated from the general population and was housed in the Admissions and Orientation building with the two other inmates who were transferred from FMC Lexington.

82. W.T. sought health care at Alderson and was refused. She had a herpes outbreak and saw a Dr. Wright who told W.T. that the doctor "didn't have anything to do with what happened at FMC Lexington," and she would not give W.T. her medication.

83. W.T. has been denied psychological care to aid in her recovery from sexual assault: W.T. asked to speak confidentially with a rape counselor and was told that it cannot be arranged on an unmonitored line.

84. Finally, on or about September 2020, attorneys from Calwell, Luce, diTrapano, PLLC – the law firm filing this complaint – were denied confidential legal calls with W.T.

12

85.    A Ms. Rebecca Daniels at Alderson insisted on standing in the room with W.T. in contravention of Plaintiff's right to have a confidential conversation with her counsel.

86.    Attorneys from Calwell, Luce, diTrapano sent a letter memorializing the incident.

## COUNT I – CLAIMS AGAINST HOSEA LEE PURSUANT TO THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION

87.    W.T. re-alleges and incorporates by reference all of the preceding allegations as if set forth herein.

88.    As an inmate in the custody of the United States BOP, W.T. had a clearly established right under the Eighth Amendment to the United States Constitution not to be subjected to cruel and unusual punishment while incarcerated.

89.    Defendant Lee's actions constitute cruel and unusual punishment in the forms of sexual abuse, assault, battery and rape.

90.    W.T. was not sentenced with a prescription for any form of sexual abuse; it is not a legitimate form of punishment.  It is not an ancillary component of any prison sentence, and it serves no legitimate penal purpose.

91.    All of Defendant Lee's acts and omissions were taken while acting under color of law and in the scope and course of his position as an RDAP instructor at FMC Lexington.

92.    Defendant Lee, individually, failed in his duty to provide W.T. with constitutionally safe and secure conditions or confinement.

93.    Defendant Lee acted intentionally, maliciously, oppressively and/or with gross negligence against Plaintiff's constitutional rights.

94.    As a direct and proximate result of Defendant Lee's misconduct, W.T. was subjected to physical and emotional injury, depression, post-traumatic stress, embarrassment,

13

and other damages, all or some of which shall continue indefinitely or permanently, as well as retaliation.

95.     Defendant Lee's conduct was of such a quality and nature as to warrant his liability for punitive damages, in accordance with applicable law.

96.     W.T. is also entitled to recover from Defendant Lee all compensatory damages recognized by applicable law.

## COUNT II – CLAIMS AGAINST THE UNITED STATES OF AMERICA UNDER THE FTCA: ASSAULT AND BATTERY

97.     W.T. re-alleges and incorporates by reference all of the preceding allegations as if set forth herein.

98.     The actions of Defendant Lee constitute assault and battery in violation of state law.

99.     Defendant Lee assaulted and battered W.T. through, but not limited to, unwanted, non-consensual sexual abuse, sexual assault, and harassment.

100.    All of Defendant Lee's acts and omissions were taken while acting under color of law and in the scope and course of his employment as an RDAP Instructor at FMC Lexington.

101.    As a result of Defendant Lee's sexual assault and battery, W.T. suffered physical and emotional injury, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently.

102.    Under the Federal Tort Claims Act, the Defendant, United States of America, is liable to W.T. for the unlawful actions of Defendant Lee as he was acting within the scope of his employment with the United States BOP.

## COUNT III – CLAIMS AGAINST THE UNITED STATES OF AMERICA UNDER THE FTCA: NEGLIGENCE

103.    W.T. re-alleges and incorporates by reference all of the preceding allegations as if set forth herein.

104.    Defendant the United States of America is responsible for the oversight of its employees, which includes officers and staff at federal correctional institutions, including FMC Lexington.

105.    Pursuant to the Federal Tort Claims Act, the United States is liable for damages caused by the negligent or wrongful acts of its employees acting within the scope of their employment, under circumstances where the United States, if a private person, would be liable in accordance with the laws of the State of Kentucky.

106.    Federal law specifically requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and to "provide for the protection . . . of all persons charged with or convicted of offenses against the United States."  18 U.S.C. § 4042(a)(2)-(3).

107.    Defendant United States and the supervisors and employees of FMC Lexington have a duty to provide inmates, being in their custody, with a safe and secure environment, free of dangers, including the dangers of sexual harassment and sexual assault.

108.    As a premises owner/operator, the United States has a duty to provide inmates with a reasonably safe place, which specifically includes a place reasonably free and safe from known or suspected sexual abusers and rapists and/or individuals who pose a foreseeable risk of sexual abuse or rape.

15

109.    Correctional officers and other prison officials and representatives at FMC Lexington have a non-discretionary duty, pursuant to PREA, to enforce a policy of "zero-tolerance" with respect to sexual abuse of inmates by staff.

110.    Correctional officers and other prison officials and representatives at FMC Lexington have a duty to protect inmates from harm caused by correctional officers, and other prison officials and representatives, specifically including Defendant Lee.

111.    Correctional officers and other prison officials and representatives at FMC Lexington have a duty to disallow or sufficiently monitor and supervise one-on-one interactions between inmates and prison representatives such as Defendant Lee.

112.    Correctional officers and other prison officials and representatives at FMC Lexington have a duty to house inmates in a safe and secure manner.

113.    Pursuant to 28 C.F.R. § 115.31, BOP and FMC Lexington have a non-discretionary duty to train employees on how to prevent sexual abuse and sexual harassment, the right of inmates to be free from sexual abuse and harassment, the dynamics of sexual abuse and harassment, the common reactions of sexual abuse and harassment victims, and how to detect and respond to signs of threatened and actual sexual abuse and to ensure that such training was properly followed.  BOP and FMC Lexington breached this duty and such breach was a proximate cause of the injuries and damages alleged herein.

114.    Pursuant to 28 C.F.R. §§ 115.31 and 115.33, BOP and FMC Lexington have a non-discretionary duty to train employees and advise inmates of their right to be free from retaliation for reporting incidents of sexual harassment and sexual abuse by BOP employees and representatives and to ensure that such training was properly followed.  Plaintiff was retaliated

16

against, and therefore BOP and FMC Lexington breached this duty and such breach was a proximate cause of the injuries and damages alleged herein.

115.    Pursuant to 28 C.F.R. §115.17, BOP and FMC Lexington officials have non-discretionary duties with respect to the hiring, promotion, and periodic review of their employees.  Those non-discretionary duties include duties to consider any incidents of sexual harassment, whether the employee has engaged in sexual abuse, and whether the employee has been convicted or civilly adjudicated of sexual abuse.  Upon information and belief, BOP and FMC Lexington failed to perform their non-discretionary duties with respect to Defendant Lee or failed to appropriately responsively act if they did perform such duties.

116.    BOP supervisory officials have a duty to monitor, supervise, train, and discipline employees/representatives at FMC Lexington, specifically including Defendant Lee, in order to ensure that staff/representatives properly perform their PREA-mandated duties so that inmates' Eighth Amendment rights are not violated.

117.    Prison officials at FMC Lexington knew or should have known that Defendant Lee should not have been permitted to have unsupervised access to inmates, including W.T., to whom he posed an excessive and unreasonable risk.

118.    Through the conduct of Defendant Lee and other BOP employees/representatives, all of the duties encompassed by this count were breached, and as a proximate result Plaintiff sustained injuries and damages.

119.    As a direct and proximate result of these breaches of duties, W.T. suffered personal injuries associated with and arising from multiple sexual assaults and rape including, but not limited to, severe physical and emotional injury, herpes infections and health care to

treat lifelong infections, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently, as well as retaliation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Honorable Court grant her the following relief:

1.      Compensatory damages as to all Counts;

2.      Punitive damages as to Count I against Defendant Lee, and not as to any Count against the United States of America;

3.      Reasonable attorneys' fees and costs in accordance with applicable law; and,

4.      Such other further relief as this Court in its discretion deems just.


## **JURY DEMAND**

Plaintiff hereby demands a jury trial on any and all Counts so triable under applicable law.

> **W.T.,**
> Plaintiff
>
> */s/David G. Bryant*
> David G. Bryant (KYSB# 91351)
> David Bryant Law, PLLC
> 600 W. Main St., Ste. 100
> Louisville, KY 40202
> Telephone: 502-540-1221
> Fax:  502-540-1200
> david@davidbryantlaw.com

*/s/L. Danté diTrapano*
L. Danté diTrapano, Esq. (WVSB# 6778)
Benjamin Adams, Esq. (WVSB# 11454)
Alexander McLaughlin, Esq. (WVSB# 9696)
CALWELL LUCE DITRAPANO, PLLC
500 Randolph Street
Charleston, WV 25302
Telephone: 304-343-4323
Fax: 304-344-3684
dditrapano@cldlaw.com
badams@cldlaw.com
amclaughlin@cldlaw.com


*/s/Jay T. McCamic*
Jay T. McCamic, Esq. (WVSB# 2386)
MCCAMIC LAW FIRM, PLLC
80 12th Street, Ste. 305
P.O. Box 151
Wheeling, WV 26003
Telephone: 304-238-9460
Fax: 304-830-5324
jay@mccamic.com

*/s/Anthony I. Werner*
Anthony I. Werner, Esq. (WVSB# 5203)
JOHN & WERNER LAW OFFICES, PLLC
Board of Trade Building, STE 200
80 - 12th Street
Wheeling, WV 26003
Telephone: 304-233-4380
Fax: 304-233-4387
awerner@johnwernerlaw.com